Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.     Okay. Okay. Okay. Okay. Okay. Okay. The honourable judges of the United States Court of Appeals in and to the 7th Judicial Circuit, hear ye, hear ye, hear ye. All persons having business before this honourable court are admonished to draw near and give their attention, as the court is now sitting. God save the United States and this honourable court. Good morning, ladies and gentlemen. Oh, it's loud today. Our first case for this morning will be Abalon against Lavalot Property Management. Mr. Brannett. Good morning, Your Honour. This is James Brannett on behalf of the defendant and appellant, Lavalot Property Management. May it please the court. For the plaintiff to prevail in this case, he had to prove that there was a default by the tenant under the lease, the tenant, and that we knew we had actual knowledge of that default under the lease. The paragraph of the lease that he's relying on is 18.1.4, which said there is a default if you do not continuously operate or engage in continuous operations, with exceptions. However, the evidence in this case did not prove any breach of that provision. There was no default by the tenant. Well, they weren't operating. That's true, Your Honour. The question is, though, that provision, 18.1.4, there's nothing in that paragraph that requires that the continuous operations begin on the day the lease is signed. Now, I find this a fascinating position on your part because it sounds as though, in your view, this lease could start and there could never be an operation. No operation the day the lease is signed, no operation six months later, no operation 15 years later. Is that how you read this lease? As long as the tenant is paying the rent and the tax isn't fulfilling every other obligation. How does that conform to the language, it shall constitute an event of default, and so forth, if tenant fails to continuously operate its premises within, its business within the premises? That's the first part of the sentence. Exactly. Then there's an exception, but you have inverted the exception to be the rule. Well, first of all, again, the continuous operations, when does it have to begin? Does it have to begin with day one? Why not? Remember, this is a 20-year lease. I want to know why not, because the only thing you had to do to postpone the continuous operations would be to sit down with the tenant and give the landlord's written approval to be not operating. And that's exactly what happened, Your Honor. No, there is no written approval. There is. The signing of the lease itself, with the understanding of both sides to that lease, that they were not going to start operations for at least nine months. How do we know that on the language of the lease? How do we know that both sides are winking at each other saying, well, we don't really mean 18.1.4? By their actions, by their objective actions. They did not begin operations. They began demolition. They began tearing out the inside and gutting the restaurant so that they could remodel it. That is the actual historical events of this case. They continued to fulfill every other obligation under the lease, both sides, except for operations, because they both knew and they both objectively demonstrated their understanding of that lease that they were going to dismantle it and rebuild it as a Hardee's. I don't see why that isn't still, from a third party's point of view, an event of default. Because the third party is a stranger to the contract. We're talking about whether we had action. The third party, however, is investing on the strength of that contract and the compliance with it and the warranty that there are no events of default. And if I understand you correctly, Mr. Brannan, you're arguing to us that the lease unambiguously allowed the tenant never to operate the restaurant there throughout the course of the lease. But I thought in the trial court, the whole approach was, well, this lease is ambiguous. It's confusing. Mr. Lenny, what was his name? Lena Chernoy, ma'am. And the poor Mr. Chernoy was confused and didn't understand the lease. Wasn't that the theme of the trial? I don't think it was that he didn't understand the lease. As a legal matter, at worst, it's ambiguous. And therefore, you look to the actual conduct of the parties to the lease, not to some understanding of a stranger to the lease. How was the jury instructed on this question of default? They were instructed that they had to show a breach of this particular provision. I don't think there was any… The question was basically given to the jury, correct, as to whether the tenant was in default and whether the defense knew about that, right? Right. But whether we knew about it required some understanding on our part that there was a default. There was no… But the jury is given this question. I mean, here's this lease, which you can read quite extraordinarily as actually, despite saying it's an event of default, if you fail to continuously operate, you read that as something that says you actually never have to operate continuously or otherwise. But the jury is given these questions, and the jury doesn't resolve this your way. Your Honor, if I suggested that they never had to operate under that provision, that was a mistake. My point is, though… But when? That's your brief. No, Your Honor, my point is that… You said in your brief they would never have to open up the restaurant as long as they keep paying the rent. In effect, they could as long as the landlord gave approval for doing that. And as long as they were paying, he obviously would. I mean, you're not… You're arguing a very difficult position in light of the fact that there's a jury verdict here. And so now you're saying, well, somewhere hidden in this language of 18.1.4, there is an obligation to operate. And then a few minutes ago you said, well, there doesn't really have to be written approval if everybody is performing in a certain way, except maybe there does have to be written approval sometime. I'm not sure what your position is. I think you've read this paragraph entirely out of the lease. Your Honor, I disagree because we also have, moving on to the language in there, that they can take at least 90 days to remodel, and they can get more than 90 days with the approval of the landlord. And they got that approval. And under the law, that approval did not have to be in writing. The parties to the lease can decide that they can make oral approvals. First of all, there was written approval because of signing the lease with that understanding of both parties that they were not going to begin operations for nine months to a year. I think the position you're taking now is that the warranty of no breach is essentially meaningless. Because if I understand you correctly, the landlord, for example, could excuse payment of six months' rent. You know, tenant says we aren't able to open, we're having a tough time, economy's tough. The landlord says, okay, we'll just write off these six months. The landlord has then waived or excused that breach and can then what? There's no default? Is that right? The question is whether there is a default at the time of the purchase agreement. No, but Judge Hamilton's asking a somewhat different question, which is how much of this lease can be modified by these understandings between the parties? When somebody else is investing in the lease, can the landlord just say, oh, never mind the rent, never mind the continuous operation, never mind what? Anything? There really isn't any warranty left, is there? As between the parties, that's perfectly allowable. I understand that. But my concern is that your theory then guts the warrant. But the purchase agreement, the warranty in there requires that we believe and have actual knowledge that there is a default. They're the ones that impose. That's not my question. Okay. Would it be correct that under your view that the landlord could decide to excuse or waive breaches, therefore meaning there's no default, and at the same time, warranty to the buyer, there's no default, even though the landlord is just excusing all kinds of material breaches? Yes, we can if the purchase agreement, if our agreement says it has to be to our knowledge that there is a default. I'm beginning to understand why the jury found fraud. Well, but let me finish the point about the 90 days and the extensions. Those were all given. All those approvals were given. There's no dispute about that, that we agreed to extend it well beyond 90 days. By the way, it was 90 days within a calendar year, so it could extend up to six months even without our approval if it lapped over through December. In any event, we did give those approvals. The law does not require that those approvals be in writing. So based, again, on our knowledge, there was no default because we gave approval for the full amount of time that they took. I mean, you have to—when you say that the law doesn't require this to be in writing, I still think you're conflating what the parties can do and how they can— essentially you're saying they amended the provisions of the lease that required writings to delete the writing requirement and to substitute an oral approval requirement, and then the parties moved on with performance by conduct or whatever. But this is a lease that was assigned to an investor, Mr. Abalon, who has no way of knowing anything but what the written documents say. And so to bind him to all of these understandings between the parties, and frankly, Mr. Ciorna is right in the middle of all of this. All of these companies seem to boil down to him, which is why I believe the jury probably did find that there was an effort to mislead Mr. Abalon as to the status of the lease. First, I don't think there's an amendment when we give oral approval rather than written. There is an amendment because it says without first obtaining landlord's written approval. Correct. So the word written is in there, and somehow you've deleted it. If you want to call that something other than an amendment, I don't know. It's not an amendment because we can always enforce it later. If we deleted it, we wouldn't be able to ever require our written approval in the future. But under the law, we can. We can resurrect it. Going back to Judge Hamilton's question, how much else can you waive? You can waive that it be a Hardee's franchise. You can waive that it ever open. You can waive the payment of rent. You can waive everything. Well, let me cut through all of that, even assuming your arguments and the plaintiff's arguments about whether they were in default. Whether that is a default that is a breach of the warranty or a breach of some duty we had to disclose to them the facts. The undisputed facts are that they knew everything that we knew. I'm not sure those are undisputed facts. The jury didn't find that. Mr. Brannert, on that point, can I ask you a procedural question? Sure. I understand you to be arguing that the plaintiff did not actually rely on this warranty. Is that correct? Correct. Okay. Is that argument in your Rule 50A motion? I don't recall, Your Honor. And it's critical? Well, I'm looking at it and I don't see it. I think that under the—I'm sorry. One of the cases that we cited is that when we raise an argument about the lack of deficiency of proof, that we can, even on the 50B motion, we can add additional arguments about the lack of proof, a deficiency of proof. You're saying the plaintiff failed to prove his case. That's enough for you to bring up any issue in 50B? Is that the theory? Any argument about the fact that they failed to prove their case. What case holds that? I'm sorry. I don't have—I can look it up for rebuttal, but it's— I don't think you have a case. I'm looking at the portion of the district court's opinion where he's specifically talking about Rule 50 and he says that Rule 50B authorizes a party to renew the 50A motion, but he says and quotes both the advisory committee notes. He quotes—he cites the Passananti case from this circuit and some other cases, and the Supreme Court has really been tightening the rules on that. You don't just throw in the kitchen sink on 50B. You get to carry forward what you did on 50A. The case citation that I was referring to, I believe, is 869 F. 3rd, 598, and it talks about a 50A motion focused on the sufficiency of the evidence to show unfair discrimination, and the 50B motion also attacked the sufficiency of the evidence as cherry-picked, so it was a new argument about the sufficiency of the evidence. And as I interpret the case, you know, obviously it's up to you to do that, but as I interpret the case, that allows a different argument about the lack of the sufficiency of the evidence. And again, on rebuttal, I'll let you know what the case name is and the exact site. I'm not sure that's consistent with the advisory committee note. I would be very surprised. If sometimes you may have made a complaint about the sufficiency of the evidence and that's enough to alert the opposing party of different types of insufficiency, but you are taking this a step beyond, I think. Your Honors, can I ask a question on this question about reliance? I have some questions for plaintiffs. It's certainly an unusual situation where a fellow is spending a lot of money to buy a property without having visited or looked at it himself, where he would have presumably seen a gutted building that was not operating as a restaurant. But the cases that you cited in your reply brief from Illinois on that point, in particular I think the Spectrum Ed case, say that the point of a warranty in this sort of a deal is that the recipient of that warranty is allowed to rely on it without having to be reasonable in doing so. That suggests to me from your cases that as long as Mr. Avalon was in fact relying on that warranty, and I believe there was evidence that he did, he's allowed to do that. The law in Illinois is that you can rely on it, but that if you do double check, you cannot rely on it anymore. And that's exactly what happened here. He didn't see it with his own eyes, but he sent John Chaney, the inspector out there, and that guy sent him back photographs. So he did see with his own eyes exactly what the condition was. He knew from the environmental report that he was getting a warranty from your client that the tenant is not in breach. He's getting a warranty that they were in continuous operations except for maybe a period of 90 days. That's his claim. That's his argument. But the fact is that he knew that they had not been in operations for two years. They knew from the environmental report that we gave them that that restaurant was vacant. They knew from what Zachariah told Denker and Cain that they had not commenced operations since May of 2013. They knew that they had not made a single sale of food for two years.  without any operational equipment, without a kitchen, without electrical, and yet they went ahead and made the decision to buy it. They navigated themselves based on their own conduct and what we told them. We told them everything that we knew about that operations. They knew everything about it themselves. In fact, they knew more because they sent John Chaney. We weren't in Illinois. We didn't send anybody there. They did. They knew more about that building than we did. They knew more about the lack of operations there than we did. They knew that there had been no restaurant whatsoever for two years. Well into your rebuttal argument, you know. Your rebuttal time. Thank you, Your Honor. Keep going. I'll save the rest for rebuttal unless you have any questions. All right. Thank you. I think that would be fine. Thank you. Mr. LeMay. Good morning. My name is Robert LeMay and I represent Ricardo Avalon. May it please the Court. I would like to address the first issue that was raised by the appellant regarding the issue of whether Lovello had knowledge of the default. It is our view that this is along the lines of a defense that Mr. Chernoy is saying, I am naive and I cannot read. And that was, in fact, the argument that was made to the jury. The jury did not believe it. The jury could read the lease and they understood what a continuous operations clause was. And they, in fact, did not believe anything that Mr. Chernoy told them and indeed found that he had committed fraud. So explain to me, in your view, why all of the things that Mr. Brannett was saying just before he sat down about the amount of notice that Mr. Avalon had that things were not running well. Your position must be that that has no effect on this case and I'd like to know why. I think counsel, with all due respect, is not properly relating what the record reflects. What the record reflects is that Mr. Avalon and his lawyer sent Mr. Cheney to do a very, very brief inspection. You can read Mr. Cheney's testimony. All he was even capable of doing was analyzing, was there a building there? What did the roof look like? What did the brick look like? What did the parking lot look like? That was it. He didn't get inside? He did go inside and he said that there were workers inside. And he was not there to analyze whether or not a franchisee had been operating. That was not what he was asked to do. It was a quality of the building in terms of are there going to be repairs that need to be made to the roof, to the air conditioning system, that kind of thing. That's what the evidence reflects. As to the issue— So are you saying that you think the jury could have thought from his pictures  That argument was made directly to the jury. The photographs were before the jury. Everyone saw that. There was testimony by Mr. Cheney, by Ms. Cain, who reviewed the report. And she's a lawyer. She's not a construction expert. And the jury believed that it was not sufficient notice to overcome the fact that there had been a direct representation that there was a continuous operations clause. Now, I think the argument that is made suggests that Mr. Abalon thought that a re-imaging, which was the word that was used, had ceased operations at the restaurant, and he should have known that it lasted for more than 90 days. That is what I believe the argument was that was being made. Now, I think that argument actually misses the point. The default alleged, as we've noted, in 18.1.4, was that the tenant ever operated. And the reality is, when you read the record, you read Danker, you read Cain, and you read Abalon, it was inconceivable to them that someone would be offering for sale a piece of property that is an investment and a lease. It's like a bond. It's a triple-net lease that's supposed to return this income, and that tenant had never, ever operated. Well, in the meantime, they were being told that this was the greatest tenant in the world, right? They were. They were absolutely being told the opposite. And they were direct representations that this tenant was a great tenant, that they had no problems with the tenant, which, of course, the jury found not to be credible and not to be true. But wasn't the tenant, while these operations, while these rehab operations were going on, paying rent? I mean, it takes a while for the rent payment to dry up. The evidence that Mr. Lovello offered was that the tenant had paid rent. We don't—there wasn't a lot of other information about that. That was the only evidence that was before the court. We didn't know. We didn't go take depositions to determine that. We offered no evidence on that point. My only suggestion would be that that was offered by Mr. Chernoy, and Mr. Chernoy, whatever he said, the jury did not believe. So at worst, I think, the evidence is conflicted. And there's a conflict as to what exactly Avalon, Kane, and Denker knew. This argument was made at trial. Mr. Lemay, let me ask you about this problem, about what Mr. Avalon knew about the condition of the property. I say for some of us it seems rather remarkable to make such an investment on this scale without at least putting eyes on the site. But I understand that's what happened here. I wonder if you could address the case law that was first raised in the defendant's reply brief, addressing your reliance on the Intec case and the series of Illinois cases about the ability to rely on a warrant or not rely on a warrant. Your Honor, I believe that the cases that are cited by the appellant are not on point because I believe that they are all UCC Article II express warranty cases. Not all of them are sales of goods. It's a mixture. The ones that I recall, Your Honor. My belief of Illinois law is that in the UCC Article II situation, in order for there to be an express warranty, there needs to be reliance upon it. In this case, this was not a sale of goods. It was a sale, in essence, of real estate and a lease. It's more like a sale than income flow. Income flow. It was income flow. So was there reliance? Let's assume that the law is that reliance is required. There certainly was reliance. Not because Mr. Avalon and Ms. Cain said that. Ms. Cain said, I added those provisions to this form agreement with respect to the default under the lease for the very reason that we can rely upon it. And then further, in the last clause of paragraph 10 of the purchase agreement, it makes it abundantly clear that the parties understood that the buyer, in this case Mr. Avalon, was in fact relying upon these representations because it says that it is agreed that these representations and warranties are material and shall survive closing. So it's abundantly clear. So if we're looking for evidence of actual reliance, we should look to Avalon's testimony, Cain's testimony, and the lease itself. You would look at Avalon, Cain, and Danker. And there is absolutely some, there's a confusing email that I would like to address that is probably the best evidence of what counsel is talking about, and that's an email to Danker. When you read Danker's testimony, it's evident, particularly where, and I can cite you a reference, but this concept that it was inconceivable to them that it was not operating. So had they been told? Maybe there's evidence that Danker may have been told. She certainly didn't tell, or it didn't register on them. Well, there had been a string of fast food restaurants in that building, right? I'm sorry. There had been a number of fast food restaurants in that building up to the point that this transaction takes place, right? Your Honor, my understanding, and the record reflects, that this building had been vacated as a franchise restaurant sometime in 2013. The property then was purchased by JC123 from the owner at that time, JC123 was an affiliate of the tenant. The tenant, JC123, the affiliate of the tenant, then sold it to Lavello, and it was originally sold for $321,000. Oh, and that's when they popped the price up to $1.1 million. And they popped the price up to $1.1 million to Lavello, and then Lavello held it. If you look at Exhibit 40, which is the summary of everything that Mr. Chernoy knew, he knew no construction was going on. He, in fact, knew that there was indeed, I think his testimony was, he had no reason to even believe that there was construction going on. So your theory has to be that the jury found this fraudulent from the get-go, and even though maybe two years later, Mr. Abalone finds out that the building is under construction, that doesn't tell him what was happening two years earlier. That's exactly correct. Yeah, the environmental report is dated, I believe, in July of 2013. It's an incredibly thick document, and so they're pointing to a small provision within a very thick document that says prior to May 2013 it had been a vacant building. I'm not sure what that has to do with the two years subsequent when Mr. Abalone was purchasing it in 2015. So... Mr. Lemay, can I ask you, one thing that troubles me about this case was that the district court, in dealing with post-trial motions, denies motion for judgment as a matter of law to the defense, but then says the motion for a new trial is moot, at least in part. Right. That's troubling to me, because obviously the district judge has discretion in deciding whether to grant a new trial or not,  Well, my recollection of the order, Your Honor, is that he said something like C-INFRA, and so he had addressed... It's pages 5 to 8, is what he said. Yeah, so my impression of it was that he was saying, look, I addressed all of these issues, in my opinion, and I found... I was worried about that too, but you're saying the best you can make of that is that his discussion to which he referred was enough to show that he did not think the verdict was against the great weight of the evidence or was so troublesome that another jury should look at it. Right. That was a much higher standard, a much more difficult standard, and he had already determined that... That's the problem. It's a lower standard to get a new trial, so even though... I'm not going to grant a 50-B motion, but this really just strikes me as fundamentally wrong, and so I'm going to go ahead and grant a new trial. That's fine. You can do that. Right. All I can say is I felt like my understanding of the reference in the order was that he had sufficiently addressed the items prior in his opinion. That's all I can say. Your best argument is probably that it's highly unlikely that Judge Mim did not understand his power to grant a new trial. However, that was expressed. I think that's fair. Could you... If I understood your argument, we've got this debate in the briefs about the Wyoming statute having to do with LLPs. I understood your argument to be that you thought the defense had already admitted in its pleadings that it would be liable if a plaintiff was able to establish its case against the actual selling entity. I was wondering if you could be a little more specific about what exactly you think Lovello admitted about its liability and where it did so. Right, Your Honor. So what occurred is that from the very beginning we knew that HRDS, which was the single asset entity, no longer existed. So we knew there was nobody to sue, and so we sued Lovello, which was its manager. And can I note, maybe you should incorporate this in your response, Lovello separately is listed at the top of the purchase agreement, not just as a member of HRDS or anything. And what significance should we attach to the fact that the purchase agreement says this agreement shall be governed by and construed in accordance with the laws of the state of Illinois? Does that have any bearing on this issue? I don't have a strong opinion on that, Your Honor. I don't think that— I mean, the district judge seems to have turned quite quickly to the law of Illinois, and maybe—I mean, they seem to be suggesting maybe you shouldn't have done that. On the other hand, the purchase agreement says it's an Illinois contract. Right, it was an Illinois contract. I don't know. I didn't do an analysis of whether the law in Wyoming and the law in Illinois is substantially different. I don't know. Well, it wasn't your obligation to do that. Did you hear that from the other side? I don't recall that. So the whole inference of the pleading, the complaints, and there was a number of them, we went on into the fourth amended complaint, was that HRDS didn't exist. It didn't exist. Lovello, indeed, was the operating entity, came forward to the court, answered, and said, yes, I am successor, and then proceeded to litigate the case. Does the record show who got the money? I mean, when this—so Mr. Abalon pays $1.55 million. Did that go to HRDS? Did that go to Lovello? Did that go to Mr. Chornoff? I mean, who did that go to, and what happened to it? I don't know. I believe that it went to HRDS as the technical owner at the time. I don't recall what the record was at trial with respect to when HRDS went dissolved. About a month later, after the closing, I thought. It was probably immediately after the sale. And so we did send discovery, and you'll note this in the motion in Lemony practice that went on prior to trial. We noted that through the actual first draft, at least the first draft of the pretrial motion, Lovello raised no defense with respect to the issue of HRDS dissolving. And, in fact, was willing to admit in the first draft that Lovello would stand before the court and accept liability or no liability and would defend. And then this was changed at the pretrial order status. For the final pretrial order? In the final pretrial order, the court addressed the issue, and he said, look, you can read the hearing that we had on that issue. It's part of the transcript. And he said, look, I believe that this has been admitted and it would be unfair to Mr. Abalon to not go forward with the trial at this time. Indeed, he's well in his 90s and he's not in good health. So those issues were talked about. And so the other thing is, at the time, I viewed it as, well, if you're really going to change your, you're really trying to change your pleading, because you've admitted this. It's admitted. We've relied upon it. We sent discovery. We asked for defenses, and that was not raised. And so I don't even know what the proper thing to do at that point would have been, but potentially it could have been a request to amend. No such request was made. So the court concluded, look, you've admitted it, therefore we're going to go to trial on this basis. Now, I believe they're misciting the Wyoming statute. The Wyoming statute 1729704 is referring to claims against a dissolved LLC when there's a certain notice that's filed. Well, as I've noted, we sued Lovello, a successor. We didn't sue HRDS pursuant to this statute. So the proper statute in Wyoming, if you presume Wyoming law applies, is the other statute that I cited, 1729304, which sets out the grounds for successor liability. And that would have been at issue. I see my time is up. Okay. Thank you very much. Thank you. Mr. Brannett, I think you have about three minutes, a little less. Thank you, Your Honor. Quickly, the case I was referring to is Andy Moore Truck Center v. Volvo Trucks, 869 F3rd 598. What was missing from the plaintiff's response here is any facts to refute the fact, undisputed fact, that he knew that there had been no restaurant operations there for two years. What's unclear to me is why that's relevant in a contract case. This is not a tort case. True. But it's a breach of warranty contract case, which under Illinois law, they are required to show that they actually relied on that warranty. And you cannot show, under Illinois law, you cannot show that you relied on it if you found out that that warranty was false. What evidence is there in the record that he knew that at no moment from the time the lease began had there been a restaurant, and indeed no restaurant going all the way back to 2013? Is there any evidence? Absolutely, Your Honor. We cited it throughout our brief. Zachariah, our broker, told Danker, his agent, there had been no operations. They had never commenced operations. There had not been a single sale of food in that restaurant since the purchase. Did Danker agree that he had been told that? What? Did Danker agree that he had been told that? Yes, absolutely. And she testified at trial that she told that to Avalon. So he knew that. You can't rely on a warranty and claim that that's the reason you bought something when you know it's not true. And that's the fact here. This is a risk calculation on his part. But I think we're evading the issue of fraud here. There were all sorts of representations that there was going to be an operation here and that, indeed, there was a lease that had a provision in it saying that operations would be continuous, and none of that was true. So it's okay if you lie? Absolutely not, Your Honor. But the fact is the jury ruled on that and said he had incurred no damages, zero dollars in damages as a result of any fraud. They made that claim to the jury. But the jury does find the damages for the breach of the contract, and there was a mutual mistake theory that everybody thought, you know, that the guarantors were going to be good for backing the things up. Maybe it was a mutual mistake of fact. I mean, you haven't talked about that at all. The judge declined to enter judgment on the mutual mistake theory. There's no cross appeal. There's no claim of error in that part. There's no judgment on mutual mistake. So the breach of the contract is the 18.1.4 that we've been talking about. Correct. And you've agreed that that was breached. It's just that you think that it was excused somehow by parties. I do not agree that it's been breached. You agree that the requirement was never met. The requirement of continuous operations existed for exactly zero days of this arrangement. You did agree with that. You have excuses for that. Yes, but that was approved by the landlord, who, by the way, did not know that there was no construction going on. There's no evidence of that. Bottom line is that there was no reliance. They knew the truth. They made a risk calculus. They knew that they had a known liability if they did not go through with the purchase. They knew that they faced capital gains taxes. They knew. To avoid that, they figured we'll take the risk on the tenant, even knowing.  I'm sorry. Thank you, Your Honor. All right. Thank you very much. Thanks to both counsel. We will take the case under advisement.